Good morning. May it please the court, my name is Stephen Rohde and I represent the plaintiff appellant Christiane Carafano. We urge this court to reverse the summary judgment erroneously granted by the district court. Ms. Carafano presented clear and convincing evidence from which a reasonable jury could constitutionally find that FLEs, whom I'll refer to as Matchmaker, were liable for damages under each of her claims for relief, invasion of privacy, misappropriation of the right of publicity, defamation, and negligence. I won't reiterate the details of the Chase 529 profile posted on the Matchmaker website, except to urge the court to view all of the causes of action and all of the issues in this case not in some abstract, sanitized setting, as Matchmaker would have you do, but in the context of an appalling, despicable, sexually provocative setting in which Ms. Carafano found herself without her knowledge or consent. The problem for me, and I'd like you to, to the extent you want to or care to, to address the immunity provisions under Section 230 of the. Yes. Indeed. What I was about to say is I wanted to address the issues raised as an appellant and to reserve my time, since that's an issue that the appellees have raised on their defense of. Well, you can go to any one. And I can even jump over. I can jump over it as well. Well, I don't want to jump over it. I think it's an important consideration in this case. So why don't you proceed to. I'm eager to point out that the immunity created by the Communications Decency Act in Section 230 would not reach any person or entity that is responsible in whole or in part for the creation or development of information provided to the Internet or any other interactive computer service. Congress did not choose to create absolute immunity for interactive computer services. They created a certain category of immunity. And when we look at this case, in contrast to every case cited by a police and every case cited by their amici, AOL, eBay, and others, no case has the circumstances in which here 62 multiple-choice questions. What about the gentry eBay case? That's pretty close to what we have here. I don't think so, Your Honor. Let me say what happened here and then distinguish the gentry case. Why don't you distinguish the gentry case now? Well, I will. In gentry, you only had a rating system, positive, negative, and neutral. And based on the number of positives, the number of negatives, or the number of neutrally, color code was automatically given. There was nothing approaching the 62 questions and answers in which here Matchmaker was involved in whole in creating the content of the answers to the questionnaire, which form the gravamen of the actionable claim here today. They created the answers that what is your living situation? Married and we swing. Or have you had a homosexual experience? One of the choices. I might be persuaded to have a homosexual experience. What style of dress do you prefer? Nude. What type of movie do you like best? Pornographic. Finally, why did you call? Scouting out for swinging couples. In a broad and comprehensive way, this website, not only in part, but in whole, created the content, the only content, putting aside the essay questions for a moment, that a member could choose. They were not some neutral, common carrier, putting up a space for a member to describe themselves for potential dating. They completely shaped the content that would be broadcast over this Internet site. None of the cases. The Gentry case has the most innocuous example of positive, negative, and neutral. So how would you state the rule if you're saying that the difference is perhaps the volume of questions? I mean, if we were to write a rule drawing a line in the case and saying, what is content creation, what is not, how would you suggest we articulate it? I would say that in those circumstances in which an Internet service provider had created the very words upon which the underlying action was based, in a comprehensive sense that limited the parties to those words, then it was actionable because they had either created or developed, in whole or in part, the content that was actionable in this case. Well, let me give you another example. Let's say that there are 62 questions of someone who's selling an antique car, and they all go to fairly fact-driven circumstances of how it runs and so forth. And it turns out this is made up out of whole cloth by someone. There's a car that's listed on there, and all the answers are just completely made up. Is that actionable under your theory? You're giving me 62 questions, multiple choice answers. Right. And the content now, the content of the answers. Remember, one of the answers was single, living with kids. So one of our key provisions for invasion of privacy was the very content of that answer. And that answer was provided by a matchmaker and selected, in this case, by whoever put up the website. In your case, if that was a comparable circumstance in which one of the answers written by the website provided the underlying content for the underlying gravamen for the cause of action, then I think if it meant create or develop in whole or in part, it would match that standard. So if you had a question that said condition of, then one of the answers is a rusted underside. And that would be the creation of content if they checked the box? Well, I think we have to take, again, you have to give me 62 of those. I've tried to keep the hypothetical, but taking it out of the context of this case. Well, I want to take that. Because we have to decide what the meaning of content creation is. Well, I understand in asking the hypothetical at this argument, you want to take it out of that context. But in the factual pattern, you also had four photographs, you had the essay questions, and you had the 62 multiple choice questions in this highly salacious context. So I don't think, I think as you move along, the very fact that your hypotheticals move me along the continuum to something very innocuous is what unlinks it from the context of this case. I mean, the question in construing this statute, which is entirely removed from from the particular contents of this Web site, is what does it mean? What does content? What does content creation mean? And whatever it doesn't say salacious or not, those words aren't found in that. No, but whatever it means, Your Honor. It means that when you give, I think the number is somewhere upwards in a hundred, more than a hundred responses because there were multiple responses to 62 multiple choice questions. Whatever it's going to mean in the next case, I think Your Honors can craft an opinion which says that where a Web site provides the limited content, content from which the user must choose the answers, and the, in totality, those answers form the gravamen of the complaint, then you have placed this particular Web site outside of the immunity of Section 230. Let me give you another example, a real life example. There is a law clerk Web site, a hiring Web site, that has a number of questions on it. The idea is to pair, and judges as well, judges and clerks can post information on this particular Web site, but they have multiple choice questions, as I recall, or at least they are asking for content. Is that content creation? Well, you just blurred the point. An essay question. An essay question, you say no, but let's assume for the sake of it, I'm just catching myself because I couldn't recall whether there are multiple choice questions or not, but let's assume for the sake of hypothetical that there are multiple choice questions. Where did you go to school? Blah, blah, blah. That would be, in your view, content creation. Well, I would have to view the entire circumstance if it was. But at least under your theory, potentially so, even though it's. Yes, because otherwise you've created a per se rule that would never give us content. I mean, I don't think AOL, eBay and Matchmaker have ever seen an Internet service provider that would not be immune. They would like this. They came here with an amicus brief. But the question is what Congress intended, what the statute means. And to give meaning to that statute, every word of it must be given meaning. Create or develop in whole or in part. And I think that whatever hypotheticals we weave, when you consider married and we swing, hot tubbing, I get high daily. New isn't sure. Aren't you really complaining about content which is third party provided rather than something that was provided by Matchmaker? No, Your Honor. If all I was. But your complaint is various comments about Miss Carapano that are made there. Isn't that really the heart of it? And isn't that something that's outside the content which Matchmaker provided? No. If all if all we were complaining about is third party content, I wouldn't be here today. The heart of this salacious false website profile that was posted goes to the core of the answers to these 62 questions. And the content for those answers was not provided by the outside user who posted the profile. It was provided by Matchmaker. And while we know we can always extend. And I understand. Suppose that the suppose that the person who put this information into the computer stuck with the questions that Matchmaker provided and the answers, the various sub answers. Would would you have a case? Yes. I'm giving you a cat, both a categorical answer to interpreting the statute and the specifics of this case. And I think Matchmaker could have had a neutral. Be a neutral common carrier. Put up your ad to get dates. Here's your service. They could have done that. They didn't do that for either marketing purposes or other commercial purposes. They listed hundreds of choices in answer to the 62 questions. It was not third party content. It was their own content which they hosted. Appellees. Your real objection, though, to the home address and telephone number and those things. If those had not been provided, would you have a case? Well, that's what I mean by first. It's categorical. Given this, they are not immune. And then you look at what happened in this case in terms of the profile that was posted. Once you meet the standard that they are a Web site which generally creates or develops in whole or in part content, then they are not immune under 230. Well, is that necessarily so? For example, isn't there a construction of 230, which would limit the immunity to the matters deemed published or the matters in which the Web site was arguably in involved in the creation of the content? In other words, to the extent that the multiple choice questions were the subject of the suit, then they then under this theory, the defendants would not be immune. But to the extent that the phone number was provided, which was pure, which was not contained on the form that they might enjoy some immunity. Well, there is that theory. There is that theory. And under that theory, they would be liable for single living with kids. And the home address, which was listed in the profile, not provided by the Web site. I actually think it's a categorical analysis. You first have to look at the service. I understand. I understand what your argument is. My question is, why shouldn't we construe it as the immunity in a little more limited fashion? Well, because I think there's nothing that suggests that Congress intended that. They spoke in terms of in whole or in part content or development. And I don't think that that means you go to the on a case by case analysis. Instead, my view is you do the categorical judgment of whether the Web site is immune or not. And then you look at the individual circumstances of the case. So under your theory, you would reach a different result in Gentry. No, I think Gentry is distinguishable because its use of positive, negative and neutral are so innocuous. They are so. How does being innocuous fit into the statute? I mean, if I understand your theory, it's black or white. If you if you create content, you're not immune. If you. And of course, of course, then you have to prove the theory up. We understand that. So what's different about Gentry than this case? Well, because I think the content at the core of eBay are millions of auctions that people put up on the Web site. Then they have a positive, negative and neutral rating system. I don't believe I think you can reach a standard by which the lack there is no content is my point. It's a positive, negative and neutral, which then goes to the gravamen of the cause of action that anyone might assert. I think that categorically a Web site that puts up hundreds of content based answers that vary as to, in this case, sexuality, gender, et cetera. That's a categorical example of content that is either created or developed in whole or in part by the Web site. Gentry, I think, was finding a very limited rule that when you have a automatic rating system, then you're not. You don't fall or you do fall within the immunity of the statute. And I don't think the facts of this case are comparable to the very limited automatic rating system in Gentry. I'm I see your honors were very interested in this issue. I did want to save two minutes and 17 seconds for rebuttal. Yes. And the fact that we used up all your time on this issue doesn't mean that we've ignored the rest of the issues in the case. So I understand. And they are fully briefed as well. Thank you. Good morning, Your Honors. Timothy Alger on behalf of defendant and appellee Lycos. I believe the court has identified the key issue here, and that is the threshold determination of whether this. That's one issue. Of course. But I think that many of the issues are resolved by looking at that threshold determination under the CBA. It's clear that the false and private information that's sued over in this action is the sole creation of a third party. It's the selection from many choices, far more than 100 of from of the multiple choice questions. There's 62 questions. Many of them have 10, 12, 14 answers. Most of them are innocuous. There's neutral answers. Nonetheless, Lycos is still our matchmaker for ease of reference. It's still soliciting possible responses. Yes, Your Honor. I think to make the Web site work and be interesting, we're going to have conversation starters. We're going to have clever answers. Some of the answers are spicy. I submit, Your Honor, the entire questionnaire, including all the possible answers, are in the record attached to the Simpson declaration. Right. We've seen them. It's right here. We chose not to edit them and select some of the more spicy answers. We gave the court all of the answers. And you see that there are many answers that are very innocuous. Right. But it doesn't make any difference, does it, for the purposes of 230? The question is, are you creating content? And in fact, you are by saying yes or no. You are even though the selection of the ultimate content is done by someone else. The selection is being made by the user. Sure. But the content was created by matchmaker. The choice of content, just as if a defamatory statement uses words that are in a dictionary, but we don't hold the publisher of the dictionary responsible. Copyright infringement occurs when you select a variety of notes and put them in an order that's infringing. But that doesn't make you look at the building blocks. There's building blocks here. That doesn't make the provider of the building blocks responsible. So the user, the third party user, selects these answers to the multiple choice questions. Then we have eight or ten essay questions. They're totally open-ended. And indeed, the answers that were provided by this individual that created this profile, the answers aren't even responsive to many of the questions. The questions don't direct to particular content. There's no direction there to put an e-mail address. There's no direction to put a street address for a house. There's no direction to tell people what kind of sexual interest the person has. It says, what kind of person are you interested in? What kind of describe your personality? These are innocuous, open-ended questions. Well, somebody at Matchmaker decided that these questions were important. Somebody at Matchmaker decided that they were important. Out of all the possible questions you'd want to know, you'd want to ask somebody in trying to match two people. Right. Somebody decided that the content of these questions, the questions themselves and the subcontent, was important in doing what they were setting out to do here. Yeah. They provided a series of answers that were interesting, that would make people be interested in the service and become ultimately paying members. If the service isn't effective, if the service, if the people that use it are not getting some benefit out of it, they're not going to use it. So the questions, many of the multiple-choice questions deal with physical characteristics or lifestyle choices and whether you smoke, whether you drink, whether you have a pet. They're just basic, descriptive matters. Then there's questions that talk about interests and whether you like hiking, whether you'd like to go on vacation. And then we have some questions that are obvious conversation starters. You see what kind of personality the person has, whether the person is very serious, whether you can draw, the user gets to draw from those answers. Some sort of conclusions about, is this the person that I want to engage in a dialogue through the proprietary email system? And then perhaps ultimately meet. But we're not obligated, and the United States Supreme Court has made very clear, that we don't have to reduce our service to the level of a sandbox, the dialogue of a sandbox. No, but I mean, the question is, are you entitled to the protection of 230 if you are, in fact, creating part of the content? And when you say, what style of dress do you prefer, someone answers that. With the pre-programmed answers, there is a point to be made that you've created the content. Just because they selected it, you are, I mean, it doesn't say solely. It says in part, it includes indirect, so. Well, Your Honor, the answers are selected by the third party. They're not selected by. No, I understand that. But I think, finally, in addition to the multiple choice questions, that selection process, and then the choice from open-ended questions in the essays, what made this profile false, what made this profile potentially actionable, was the false identification of the content with the plaintiff. Matchmaker did not do that. The third party did that. The third party elected to use her first name as the username. Many of the usernames are just fictional. They're made up. They don't have to be Tim, and then the number is appended by Matchmaker. I could pick Bald Man. I could do a whole sort of, make up all sorts of names. But they chose Chase. They put Ms. Carafano's picture on it. They made reference to her movies. These are selections by the third party. They are, that's the content. What made the profile false was that selection, that process. By focusing just on the multiple choice answers, we missed the point about why this is even a lawsuit. No, we haven't missed the point. But I think you took an absolutist view, and your colleague on the other side took an absolutist view, that anytime you have, at least as I understand your argument, you're saying anytime you have multiple choice questions, that's not the creation of content. Right? That's your argument. Yes, Your Honor. And I'm not sure if there is a different view, which may or may not favor you, which is that to the extent you create content, you enjoy immunity, and to the extent that the content is the sole product of the third party, then in its creation, then perhaps, I flipped that around, you enjoy immunity for anything that the third party submits, but you don't enjoy immunity for anything in which you've been a part of the greater process. Oh, I think that's right to a point, Your Honor. And the content that we provided was the selection of answers, the questions, the formatting, the structure, the process, this communication tool where people can provide information, and then they can search it and find out what, that's what we provided. But what's being complained about are the answers here. And I think Gentry, in footnote 11, nails it on the head. We note the fact that appellants allege eBay as an information content provider is irrelevant if eBay did not itself create and develop the content for which appellants seek to hold it liable. It's not inconsistent for eBay to be an interactive service provider and also an information content provider. The categories are not mutually exclusive. The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or is misleading. And here, what claim if the content is false or misleading are the answers to the essay questions. And, in fact, the bulk of her claim is in the answers to the essay questions, which are open-ended. There's some based on the content, though. It's the selection of her as the subject of the profile. I wanted to emphasize, to Your Honor, the importance of why we have multiple-choice questions. The tool that we have here is a searchable tool where you can find people that have similar interests. There's two ways of doing it. First of all, you don't get to see these profiles unless you fill out a questionnaire yourself. You can't get into the site unless you go through the process of filling out the questionnaire. So the user knows that the answers to the profiles are provided by other users. The system gives you an option. You can either ask it to automatically find your match, and then the computer churns through all the information in the database and then finds people that have, based on a percentage, answers that are similar to yours. You can also direct it to do certain types of searches. You know, red-headed women that live within 25 miles of me that don't smoke. And then the computer does the same thing, the server does the same thing. It searches and it identifies people that would meet those interests. Yeah. For example, what style of dress do you prefer? If they answered nude, you could search by that, right? Right. But the problem here is it's not just a general interest thing, because there are lots of, you know, there are some fairly innocuous questions and there are some others that could be put together to make a false profile, right? That's right, Your Honor. But the providing of building blocks, neutral building blocks, doesn't make us responsible. I don't get the dictionary analogy, I guess. You've failed to convince me on that. Give me another one that you think works. Well, all we've done here is provided information that can be selected from. That's all we've done. People do not have to pick the sexually charged, to use Plano's term, sexually charged answers. These are not questions like, when did you stop beating your wife? They are, there's a variety of choices, and people can punt with neutral answers that don't carry any real content. If you look at many of them, they don't really impart any information. Right. But I think the, I guess what concerns me is that this is not content that's created by the selector. It's content that's created by you and then selected by others. I submit that the creation of the defamatory content is the selection of the answers and the identification of those answers with Ms. Carafano. That's the creation of a false defamatory statement. It's that process that creates something that might, absent the CDA, be actionable, and absent the requirements of actual malice in this situation. Let's turn to a different topic, the newsworthiness. What is newsworthy about the private address and home number of a celebrity? Well, the law has developed such that celebrities, by choosing their manner of life, they're subject to the searching examination of the public. I understand. But I don't think there's a case yet that holds that if a celebrity may not choose to keep a home address and phone number private. Well, Your Honor, we've argued that the issue of what her address is doesn't depend on her celebrity status. I don't believe my home address is a private fact. It's viewable from the street. The restatement doesn't respect it as being a private fact. Matters that are left open to the casual inspection of neighbors are not private facts. Anybody could see where she lives by parking on the street. Well, they would know that she lived there. Pardon? They would know that she lived there, particularly. Because especially in this case where she chose not to use her stage name and she used her real name for all of these facts. I mean, I guess is it your view truly that all private home numbers and addresses, even if someone tries to make them illicit, are public facts? Yes, Your Honor. I believe that home addresses are public facts. I do not think, and there's no case that holds that a home address is a private fact. And I think if we start going down that road, we're going to, where does it stop? Any time a person tries to keep certain things private by using, in this case she had the luxury of using a stage name.  That she could develop this separate private persona where the information that for me or for you is public becomes private for her. Where I live, anybody can go to the assessor's office and find out where I live. Anybody can find out what I paid for my mortgage. That's public. That's been public. But in this unique situation, you have someone where if you, the address was not connectable with her, at least in her stage persona. So why is it, let me get back to my original question. Leaving aside the public domain question, and I'll grant you if something is truly in the public domain, then there's a different standard that may apply. But why, leaving aside that question, why is a private address and phone number of a celebrity or a fax number, why is that newsworthy? Well newsworthiness of course is a broad doctrine where it's a matter of legitimate public concern. All right. Let me just put it in that phrase. Why is it a matter of legitimate public concern what the fax number or the phone number of a celebrity is? I have a great difficulty at times saying that. So explain to me why you think it is newsworthy in that context. Because it's been part of our society for many, many years. The cases like Carlisle date back 30, 40 years, where in California we acknowledge and of course acknowledge that if somebody becomes an entertainer, that they are opening up more of their lives to public analysis. Granted. But what's the best case you have that says that just because you become a celebrity that in fact your home phone number and fax number are newsworthy items? Well we didn't publish her phone number or her fax number, Your Honor. Gosh, you keep changing my questions. You're answering a different question than I posed. What's your theory on newsworthiness of that fact? Of that particular fact? Yes. Well I don't have an answer on that particular fact. And there's no case there, is there? Pardon? There's no case on it, is there? There's no case on it. Okay. That specifically deals with celebrities and their home addresses. Okay. Well the district court said that there was a road map to the stars. Well what my argument on the road map to the stars which the court adopted was that the fact that maps are sold, it shows that there's a high public interest in where celebrities live. It wasn't that necessarily targeted her or whether she should be on a map. It's just that there's a high public interest. And it's part of our social fabric at this point. And I know that Ms. Streisand doesn't want people taking pictures of her house along the coast, but the fact of the matter is the celebrities are subject to the same rules as the rest of us. And by becoming celebrities, rather than being able to withdraw and take more of their information out of the public domain, they've actually opened up more of it to the public domain. And that's bedrock in our society. You cannot become a celebrity and accept the benefits of that while not also taking on the risks. And that's where the nature of the risk is. Well, that's what we find in libel law. The Supreme Court has said you assume the risk, you assume certain sorts of risk when you become a public figure. And those include commentary about you that might be vitriolic, might be offensive, might even on occasion be false. Right. But the touchstone in evasion of privacy law, the public disclosure of private facts is whether it's truly newsworthy or not. It's a matter of legitimate public interest. And I'm not sure as a matter of law someone's private phone number and private fax number is the subject of a legitimate public interest, even if they're a celebrity or a Supreme Court justice, particularly in this era where you have stalkers, you have terrorists. If someone decides to keep their phone numbers private, their addresses private, I'm not sure. Outside the public domain issues, I'm not sure that that's a matter that's newsworthy. I don't believe that. I don't mean to be arguing with you. I'm just provoking, trying to provoke an answer from you in response to it. I've given you my best. Okay. What else do you want to talk to us about this morning? Well, I think back to the private facts. I think it fails for other reasons, the private facts claim, including the reckless disregard requirement. Now, the plaintiff focuses on whether reckless disregard under Briscoe is the same as constitutional actual amounts. I don't think that's the issue. The issue is whether we had knowledge that this was a private fact and the disclosure of that private fact would cause some sort of harm to her. So what about the continued operation of the website after notification? Why isn't there a tribal issue of fact concerning the reckless disregard prong or test as to those hits that occurred between the time that Matchmaker had notification, that this was offensive, and the time that the site became inoperable as to her name? Well, I think the court, as a matter of law, can determine whether there's sufficient evidence for a jury to find by clearing convincing evidence that there was actual malice. And the court decided that it was insufficient. No, I understand what the court said. My question is analytically. I understand your argument pre-notification. But after your client had received notice that this was offensive and false information, isn't there a tribal issue of fact on reckless disregard for that period of time where they had the 123 hits, about 14 or 15 percent of the total hits on the website, until the website was or that entry in the website was rendered inaccessible? The evidence is uncontested here that the earliest that our system operators were able to take this down was Monday morning. What's happened is plain and simple. And that's because nobody was on duty. As I understand the testimony, they testified that nobody was on duty over the weekend. Right. Right. Now, my question is, I think there's a different argument on reckless disregard pre-notification and post-notification. That's certainly a defense, perhaps, that no one was on duty during that period of time. Does that show reckless disregard for keeping it up and not summoning? Isn't that a question of fact for the jury for that period of time? In this case, I think the evidence is so weak that the court could have properly decided on its own. It did not have to submit it to the jury. The plaintiff relies heavily on this bathroom wall case, which is a negligence case involving a private figure. Right. And the theory there is that once the defendant knew about the falsity of the statement, they had a duty to – it became their publication. They adopted it. Here we have a public figure case, and the adoption is just not by a negligence standard. It has to be something where we knew it was false, and then we acted with reckless disregard regarding its false – regarding removing it. Right. So you have the notification. The notification is not enough. There also has to be purposeful avoidance of the truth. It has to be that we not only learn that it was false or suspect that it might be false – in this case, somebody calls us other than Ms. Carofano. Someone else called us, tells us that it's false. But you need to also have this purposeful avoidance, this willful blindness. Right. And there's no evidence of willful blindness. Indeed, as soon as we could, we took it down. Saturday night is the earliest that, according to Ms. Perry, the earliest she learned about the profile. And then she talked to Ms. Carofano, and then she said she contacted Matchmaker. Monday morning, it was down. Right. And so my only question is, as for, you know, that's a certainly good factual defense to show that you acted reasonably in face of the circumstances. But it seems to me that after notification, then there may be a tribal issue of fact and reckless disregard. But the district court and this court can stand in that position and examine it, determine whether there's clear and convincing – there's enough for a jury to return a verdict for the plaintiff. Yes. And this court, although there's disagreement on the Ninth Circuit right now about what independent examination means, it's clear that the court has to take into consideration what impact there might be on speech by allowing the matter to go forward and go to trial. And here, the fact of the matter is that it's a one day, which is a – given the thousands and thousands and thousands of profiles that we post, and many calls we get from – and e-mails we get from people, it's fair for the court to conclude that a jury could not, under First Amendment principles, return a verdict for the plaintiff in this circumstance. And that's a question of law that the district court and this court can decide. Okay. You're a little bit over your time. Are there any further questions from the panel? Thanks for your presentation. Your Honor. Yes, Your Honors. In reverse order, let's not forget that this is a company that had terms and regulations that prohibited the release of street addresses, phone numbers, sexually provocative information. The risk of harm was known to them. Once we meet the knowledge of falsity, by the phone call, by the way, on Saturday, there was a service provider at Matchmaker who took that phone call on Saturday. She told the web person, oh, we have to do more investigating. We can't take that website down, even though they have the capacity to incapacitate a website pending investigation. And there were those 123 hits between notification and, by the way, the only evidence is it was removed Monday night after 7 o'clock at night, not Monday morning. So I do believe, frankly, I also believe there is substantial clear and convincing evidence that with the bounce-back e-mail, as early as October 23, they were on notice that there were serious questions as to the authenticity of the website. This Court has adopted the standards of the Hart-Hanks communication case in Masson v. New Yorker, actually had a high degree of awareness, or you can infer by the obvious reasons to doubt the accuracy, and defendant did not act reasonably to dispel those doubts or was purposefully avoiding the truth. I think they chose not to act quickly. I think there's substantial evidence in the record. Four times they were warned about that, and they didn't remove the website. It looks as though in the evidence, and maybe you can correct me if I'm wrong, though, that the hits that occurred after the notification did not result in any additional harassment. Is that true? In other words, all of the calls, the faxes and so forth occurred pre-November 6th. Is that right? I have not linked each obscene phone call to each hit or the period. Right. And I don't think that's our burden. No, but is there any evidence in the record that any of these events occurred after November 6th when the service was notified? I only know the record to say, and there were continuous obscene phone calls after October 31. And I would have to look back myself to see when they occurred. I simply want to say a couple things. Newsworthiness is clearly judged in context, legitimate public interest, community mores. This wasn't the publication of a home address in a phone book. And by the way, Planned Parenthood Golden Gate says there is a particularly strong privacy interest in avoiding the disclosure of residential addresses. Finally, they can have conversation starters. They can have clever and spicy content, but it's content. They chose to make their website perhaps more attractive by providing all the answers. Counsel said this would induce people to become paying members. And if they chose to do it to get paying members, then I'm we are entitled to hold them to the content that they put up. Finally, although I'm not running away from my view of the Gentry case, it is a California appellate court decision. I don't believe it may be persuasive to this court. I don't believe it's binding on this court as an interpretation of Section 230. And over time, I thank you for your indulgence. Well, thank you both for your presentations and your briefing. There is one additional wrinkle in the case I wanted to make both of you, or both of you, and that is that there's another case pending before this court, Basel v. Smith, which may involve the Section 230 issues. Under our internal rules, we may or may not have to wait until that case comes down, but we'll apprise you of that in the event that we elect to defer consideration of this case until Basel's decided. And we'll give you the citation of that so that you can take any appropriate steps you want to submit information in that case. Has Basel been argued? It has been argued, yes, sir. Not before this panel, but before.
judges: Thomas, Paez, Reed